**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CLEARLY CLEAN PRODUCTS, LLC**, *et al.*,<br><br>Plaintiffs & Counter-Defendants,<br><br>*v.*<br><br>**TEKNI-PLEX, INC.**, *et al.*,<br><br>Defendants & Counter-Plaintiffs. | **CIVIL ACTION**<br><br>**NO. 20-4723-KSM** |

**MEMORANDUM**

**MARSTON, J.** **OCTOBER 23, 2026**

Plaintiffs Clearly Clean Products, LLC and Converter Manufacturing (collectively, "Clearly") allege that Defendants Tekni-Plex, Inc. and Dolco, LLC (collectively, "TPI") infringe five of Clearly's patents: U.S. Patent No. 9,908,281 (the '281 Patent); U.S. Patent No. 10,189,624 (the '624 Patent); U.S. Patent No. 10,076,865 (the '865 Patent); U.S. Patent No. 10,399,268 (the '268 Patent); and U.S. Patent No. 10,562,222 (the '222 Patent). Two of the patents, the '281 Patent and the '624 Patent, are product patents, while the final three, the '865 Patent, the '268 Patent, and the '222 Patent, are method patents. The products and methods at issue are thermoformed trays, and specifically the "kind of trays used to contain cuts of meat or poultry within a plastic overwrap in grocery and other retail settings." (Doc. No. 72 ¶ 19.)

Across these five patents, the parties dispute seven claim terms. (*See* Doc. No. 143[1].) After claim construction discovery (*see* Doc. No. 80 ¶ 5), this Court held a *Markman* hearing on September 9, 2026 (Doc. No. 137). We now resolve the disputed claims.

[1] The parties had originally filed their joint claim construction brief on August 21, 2026 (*see* Doc. No. 126), 19 days prior to the *Markman* hearing. Then, six days after the hearing, TPI realized that "one of Defendants' sections of the Joint Claim Construction Brief (D.I. 126) contains two citation errors," and

# I. LEGAL STANDARD

## A. Claim Construction

Claim construction is a matter of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325 (2015). "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.,* 381 F.3d 1111, 1115 (Fed. Cir. 2004). "[T]here is no 'magic formula or catechism'" for construing a patent claim, nor is a court "barred from considering any particular sources or required to analyze sources in any specific sequence." *Phillips*, 415 F.3d at 1324. Instead, we attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.* (citation omitted).

"When construing a claim, words are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art [POSITA] when read in the context of the specification and prosecution history." *LoganTree LP v. Fossil Grp., Inc.*, No. 21cv385, 2024 WL 1406539, at *2 (D. Del. Apr. 2, 2024) (cleaned up). "The patent specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, No. 04cv1371, 2016 WL 1171496, at *2 (D. Del. Mar. 24, 2016) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). And "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the

---

TPI filed an unopposed motion for leave to amend the joint claim construction brief. (*See* Doc. No. 141.) We granted the motion, and the parties filed their now operative brief on September 17, 2026. (Doc. Nos. 142, 143.)

invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips,* 415 F.3d at 1317.

Further, "[d]ifferences among claims can also be a useful guide . . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314–15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

And there may be times where we "will need to look beyond the patent's intrinsic evidence [the claims, the specification, and the prosecution history] and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 574 U.S. at 331. This evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). "Overall, while extrinsic evidence 'may be useful' to the [C]ourt, it is 'less reliable' than intrinsic evidence, and its consideration 'is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence.'" *Power Integrations*, 2016 WL 1171496, at *2 (quoting *Phillips*, 415 F.3d at 1318).

Ultimately, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be . . . the correct construction."

*Renishaw PLC v. Marposs Societa' per Anzioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 389 (1996)).

**B. <u>Indefiniteness</u>**

"A patent's specification must 'conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as [the] invention.'" *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1340 (Fed. Cir. 2015) (quoting 35 U.S.C. § 112(b)). A patent claim is indefinite if, "viewed in light of the specification and prosecution history, [it fails] to inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

"Indefiniteness is a matter of claim construction, and the same principles that generally govern claim construction are applicable to determining whether allegedly indefinite claim language is subject to construction." *Kyowa Hakka Bio, Co., Ltd. v. Ajinomoto Co.*, No. 17cv313, 2020 WL 3403207, at *5 (D. Del. June 19, 2020) (internal quotations omitted). "The internal coherence and context assessment of the patent, and whether it conveys claim meaning with reasonable certainty, are questions of law." *Teva*, 789 F.3d at 1342. A party seeking to prove indefiniteness must do so by clear and convincing evidence. *See BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017).

## II. DISCUSSION

As noted above, the parties dispute seven claim terms. The Court considers each in turn.

### A. "being suitable for sealing a sealing film thereto using either of VSP and MAP sealing technologies"[2]

| Clearly's Construction | TPI's Construction | Court's Construction |
|---|---|---|
| "being suitable for sealing a sealing film thereto using VSP sealing technology, MAP sealing technology, or both" | Construction: plain and ordinary meaning, which is met by either (1) being suitable for sealing a sealing film thereto using VSP sealing technology, or (2) being suitable for sealing a sealing film thereto using MAP sealing technology | "being suitable for sealing a sealing film thereto by using each of VSP and MAP sealing technology separately" |

The parties dispute whether the term here creates a disjunctive that only allows for sealing using either VSP or MAP sealing technologies, but not both.[3] We find that the term is conjunctive, requiring sealing using either method; but we decline both parties' attempts to limit the reading of the term. The relevant language of the claim where this term appears is:

> A tray intended to be suitable for use in any or all of overwrap (OW), vacuum-sealed packaging (VSP), and modified atmosphere packaging (MAP) sealing technologies, the tray being; an article formed from a thermoplastic sheet . . . the extension . . . being suitable for sealing a sealing film thereto using either of VSP and MAP sealing technologies . . . .

('624 Patent at 41:13–25.)

Clearly's position is that this phrase should not be construed to mean either/or, but that it *must* allow for the use of both technologies. (*See* Doc. No. 143 at 12 (arguing that "a tray suitable for sealing using only one of these technologies is not suitable for sealing "using either

---

[2] This term appears in Claim 1 of the '624 Patent.

[3] VSP is "vacuum-sealed packaging", whereby a tray is wrapped in a plastic film and then the internal air is removed. (*See* Doc. No. 143 at 12 n.1.) MAP is "modified atmosphere packaging" which involves using heat or an adhesive to seal the tray after placing it in a selected atmosphere. (*See id.*; *see also* '624 Patent at 2:16–52.)

of" them – it is suitable for sealing using only one of them").) As support, Clearly cites both the specification and the prosecution history. The specification support comes from the preamble to the '624 Patent, where Clearly discusses how the trays it is patenting will "be the first packages which, can, practically, be sealed using all three [VSP, MAP, and overwrap ("OW")[4]] technologies" ('624 Patent at 12:38–40), thus it naturally flows that the tray extensions talked about in Claim 1 would be useable by both VSP and MAP. It argues this reading is confirmed by the prosecution history of the '624 Patent, where it amended a separate portion of Claim 1 "to recite" that the invention at issue is "suitable for use in *at least* three varying sealing technologies (OW, VSP, and MAP processes)." (Doc. No. 126-8 at 217 (emphasis added).)

TPI, on the other hand, argues that the use of the phrase "either of" creates a disjunctive choice: the tray extensions either should be able to be sealed using VSP, MAP, or a combination of both. We do not find TPI's argument compelling. TPI focuses on the examples provided throughout the preamble to the '624 Patent, many of which discuss the application of the patent to one or the other technology. (*See* Doc. No. 143 at 14–15 (citing '624 Patent at 12:33–38, 18:60–66, 24:18–20, 27:38–43, 27:58–66, 36:1420, 36:44–48).) But a patent "need not include a working example of every possible embodiment to enable the full scope of the claims." *Bayer HealthCare LLC v. Baxalta Inc.*, 989 F.3d 964, 982 (Fed. Cir. 2021). And merely because some of the '624 Patent's examples discuss how it may be applied to VSP or MAP, does not then mean, by negative inference, these examples disclose all other uses. That is the very nature of an example.

[4] OW technology "involves enveloping or wrapping a sharped article . . . with a thin . . . plastic film after foodstuff . . . has been placed on one or more faces of the articles and thereafter sealing the film to itself." ('624 Patent at 01:64–02:02.)

TPI next raises that the prosecution history cited by Clearly merely "regurgitates the newly amended language in the preamble of Claim [1]," so it is not relevant to the interpretation before the Court. (Doc. No. 143 at 15.) TPI is correct that the prosecution history here does not directly address the issue before the Court now. The patent examiner's focus in making its edits back in 2018 expressed concern that the preamble's reference to using "each of" prior to listing the three sealing technologies made the claim indefinite. (*See* Doc. No. 126-8 at 186 ("In particular, the recitation **'amendable to sealing with a sealing film using each of overwrap (OW), vacuum-sealed packaging (VSP), and modified atmosphere packaging (MAP) sealing technologies'** of claim 1 renders the claim indefinite as it not clear what is included or excluded by such broad claim language.") (emphasis in original).) This edit in the prosecution history eventually led Clearly to amend the patent claim to remove "each of" and include "any or all". (*Compare id.*, *with* '624 Patent at 41:13–16.) But the prosecution history fails to provide—and TPI has cited to no—direct support for its proposed construction of this term, so at best the prosecution history is ambiguous as to the parties' term 1 dispute. *See Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1382 (Fed. Cir. 2002) ("[I]t is inappropriate to limit a broad definition of a claim based on prosecution history that is itself ambiguous."); *Bial - Portela & CA S.A. v. Torrent Pharms. Ltd.*, No. 18cv279, 2019 WL 13494412, at *2 (D. Del. Oct. 17, 2019) (finding "the prosecution history is too ambiguous to justify reliance on it in construing the disputed term")

And, finally, TPI fares no better reasoning by analogy. At oral argument, TPI's counsel used the analogy of a person—likely at a barbecue or a Philadelphia Eagles tailgate—saying that they "would like either a hot dog or a hamburger" means they "want either a hot dog or a hamburger or you would like to eat both, but it doesn't mean that you necessarily want both a hot

dog and a hamburger." (9/9/26 Hr'g Tr., at 47:17–20.) But the analogy puts the focus on the wrong attendee. As the claim here relates to the use of "either of" two tool options, the more apt comparison is not the consumer of the food but the cook. And if the cook explains that one can flip hamburgers using either of tongs or a spatula, one would not understand that to mean certain hamburgers on the grill are limited only to tongs and some only to a spatula. TPI's analogy then, properly applied, supports the Court's construction that the tray extensions here (the hamburgers) can be sealed (flipped) using each of VSP or MAP (tongs or a spatula).

But, even though the Court agrees with Clearly that the term here was meant to embody tray extensions that will be used with both VSP and MAP, we cannot agree with its proposed construction. The issue with Clearly's proposed construction is its grammar. Read naturally, the construction Clearly proposes permits VSP functionality, MAP functionality, or both—the exact construction that TPI proposes. (*See* Doc. No. 143 at 12.) Or it could even be read as advocating for the use of both VSP and MAP technology at the same time. (*See, e.g.*, 9/9/26 Hr'g Tr., at 50:04–11 (discussing how one cannot use these technologies simultaneously).) As such, we reject Clearly's construction and instead look to "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention [that] will be, in the end, the correct construction." *Phillips,* 415 F.3d at 1315. Here, we find "being suitable for sealing a sealing film thereto by using each of VSP and MAP sealing technology separately" to be the properly understood meaning of the term. While the prosecution history failed to provide sufficient assistance, the plain and ordinary reading of the term and the claim specification reveal enough support for the Court's construction, specifically that the tray extensions at issue will be suitable for sealing via MAP or VSP, whichever a user wants.

### B. **“tray-shaped”**[5]

| Clearly’s Construction | TPI’s Construction | Court’s Construction |
|---|---|---|
| “a thermoformed article having a noncircular concave compartment.” | Plain and ordinary meaning: “shaped like a tray” | no construction needed; plain and ordinary meaning |

The parties’ core dispute here is whether the term “tray-shaped” includes circular trays. We find that it does, so we must reject Clearly’s proposed construction and find that no construction is needed here; though, TPI’s proposed construction is wholly unserious.[6]

Clearly argues solely from intrinsic evidence that the use of “tray-shaped” throughout Claim 1 of the ’268 and ’865 Patents, supports that the article being created here must (1) be noncircular and (2) have a concave compartment. We disagree as to the former, though we will briefly discuss the latter because it does not appear to be in dispute. Clearly cites to the ’268 Patent’s specification for its support for there being a “concave interior portion” in the articles here. (*See* Doc. No. 143 at 16 (citing ’268 Patent at 45:20–23; ’865 Patent at 36:50–54).) At oral argument, TPI conceded that it does not dispute that a tray necessarily has a concave compartment. (*See* 9/9/26 Hr’g Tr. at 52:22–24 (“[E]verybody understands what a tray is. We don’t necessarily dispute the part about it having a concave compartment.”).)

Having found agreement on the concave nature of trays, we move back to Clearly’s contention that its trays must be “noncircular.” In short, we reject Clearly’s construction for similar reasons to why the Court rejected TPI’s critiques of the examples in the specification of

---

[5] This term appears in Claim 1 of the ’268 Patent and Claim 1 of the ’865 Patent.

[6] As Clearly correctly points out, using the disputed term itself to try and define the term is not helpful to the Court or a POSITA. *See Sipco LLC v. Toro Co.*, No. 08cv0505, 2009 WL 330969, *12 (E.D. Pa. Feb. 11, 2009) (“Toro’s proposed construction of ‘customers’ is not helpful because it defines ‘customer’ with reference to the word ‘customers.’”).

the ’624 Patent. (*See supra* § II.A.) To be sure, as Clearly points out, the figures in the ’268 Patent “illustrate deflectable flanges formed in tray-shaped articles thermoformed from a sheet of thermoplastic material,” and none of those articles are circular. (Doc. No. 143 at 16 (quoting ’268 Patent at 8:30–32).) But Clearly is basically inviting the Court to “commit[] one of the cardinal sins of patent law—reading a limitation from the written description into the claims.” *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337 (Fed. Cir. 2001).

And beyond that, our rejection of Clearly’s construction is also supported by other intrinsic evidence in the specifications. The ’268 Patent includes a section entitled “The Shaped Article” in which the specification makes clear that the “methods described herein are believed to be applicable to articles having a wide range of shapes and sizes, especially articles which normally have a sharp peripheral edge when made by common methods.” (’268 Patent at 14:55–59.) While this language about sharp peripheral edges certainly supports the conclusion that the most common, or preferable, usage for these patents is for square-like articles, it in no way expressly limits the patent to that construction. And the ’268 specification goes on to say that “[t]he size and shape of the articles described herein are not critical.” (*Id.* at 15:40–41.) This intrinsic evidence cuts against Clearly’s more limited construction of the disputed term.

In sum, we find that the term “tray-shaped” is sufficiently clear on its own such that neither we nor a POSITA needs a construction beyond the plain and ordinary meaning of “tray-shaped.” When, or if, this case makes it to summary judgment or a trial, we are confident a POSITA, the Court, and a jury, would know a tray when they see one. *See, e.g.*, *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (“I know it when I see it.”).

### C. **<u>"stacking extension(s)"</u>**[7]

| Clearly's Construction | TPI's Construction | Court's Construction |
|---|---|---|
| "at least one portion of the rolled edge of the article that has a greater height than much of the rest of the rolled edge" | Indefinite and lacking written description support under 35 U.S.C. § 112 | "localized portions of the rolled edge that are taller than much of the remaining rolled edge and are configured to space nested trays apart at other portions of their rolled edges" |

For this term, the parties have staked out the most extreme possible versions of their respective positions. We decline both Clearly's attempt to muddle the term beyond any recognition and TPI's attempt to find the term indefinite.

We begin with Clearly's argument, which must be rejected out of hand. The context of these "stacking extension(s)" appears as below in the '281 Patent:

> 18. The article of claim 14, wherein the extension bears a **rounded stacking extension** of the rolled over edges at at least one position on the periphery of the article. 19. The article of claim 18, wherein the extension bears **rounded stacking extensions** at at least two corners of the tray.

('281 Patent at 39:34–39 (emphases added).) And in the '624 Patent, the term appears as below:

> The tray of claim 25, wherein the height of the flat portion of the spacer, measured from the bend region to the nearest part of the bent portion, is substantially constant around the entire periphery of the tray, other than at **one or more stacking extensions** at which the height of the flat portion of the spacer is greater. 28. The tray of claim 27, bearing a **stacking extension** at each of the rounded corners.

('624 Patent at 42:53–60 (emphases added).) Clearly argues that these terms should be construed to mean that at least one portion of the rolled edge of the tray has a greater height than much of the rolled edge. (*See* Doc. No. 143 at 17.) But as shown through the parties' briefing

[7] This term appears in Claims 18–19 of the '281 Patent and Claims 27–28 of the '624 Patent.

and oral argument, Clearly's proposed construction can lead to completely arbitrary and inconsistent results. *See Nautilus*, 572 U.S. at 901 (discussing how a patent must "inform, with reasonable certainty, those skilled in the art about the scope of the invention."). This inconsistency dooms Clearly's construction. *See Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377–78 (Fed. Cir. 2017) (expressing concern about "terms of degree" that are "purely subjective" and discussing how providing examples is insufficient if the claim "provide[s] no guidance to a person" and thus leaves the claim "completely dependent on a person's subjective opinion"). In its brief, Clearly directed the Court to this image as support for Clearly's construction:




(Doc. No. 143 at 31 (citing Doc. No. 126-31).) Clearly claims the stacking extensions are readily apparent in this example because each of the rounded corners (Sections 13–16 in the

image) have a greater height than the non-corner sections. But Clearly fails to grapple with the unbounded nature of its construction because, for example, the highest portion of Sections 2–4 is 3.698 mm. That "is a greater height than much of the rest of the rolled edge" and yet Clearly does not identify it as a stacking extension. And, in fact, the difference between that 3.698 mm height and the lowest height of an identified stacking extension is only .09 mm. Yet the ranges for the four identified stacking extensions and the four non-stacking extension sections have potential height ranges at least 191% greater than .09 mm. (*See* Doc. No. 143 at 31 (showing the range of Sections 1–12 is .177 mm and the range of Sections 13–16 is .172 mm).) And, at oral argument, the Court directed the parties to measure two trays provided by defense counsel, one a Clearly tray and one a purportedly infringing tray from TPI. (*See* 9/9/26 Hr'g Tr. 143:20–144:10.)[8] The parties returned with measurements (*see* Ex. 1, appended to this Memorandum) and Clearly's counsel argued the measurements showed stacking extensions in both Clearly's trays and TPI's trays. (*Id.* (identifying stacking extensions of 4.27 mm and 4.45 mm on the TPI tray and two locations of 4.52 mm stacking extensions on the Clearly tray).) But, as with the example discussed above, there was no threshold at which a "greater" rim height became a stacking extension versus when it did not. (*See id.* at 2 (showing a 4.52 mm height is a proposed stacking extension, but a 4.49 mm height is not, even when compared to the lowest bound height of 4.12 mm).) And Clearly's counsel admitted that two different measurements by its expert brought about two different height results—hardly the type of clarity that a POSITA would need when determining whether they were following or potentially infringing the patents here. (*See* 9/9/26 Hr'g Tr. at 86:22–88:08.)

[8] Clearly's expert, Philip Barhouse, attended oral argument and used calipers provided by defense counsel to measure the trays. (*See id.*)

Further, Clearly has failed to sufficiently explain how its construction aligns with the purpose of these stacking extensions as it is described in the intrinsic evidence. The '281 Patent, for example, discusses how "because the stacking extensions . . . have a greater height than much of the rest of the rolled edge of those trays, the trays . . . will nest such that the lower surface of a stacking extension . . . rests on the upper surface of the rolled edge of a tray beneath it." ('281 Patent at 22:23–30.) *First*, the specification shows—contrary to Clearly's argument at oral argument—that the stacking extensions need not *necessarily* be the greatest height. *Second*, as demonstrated by the examples in the briefing and at oral argument, discussed above, Clearly's proposed construction does not have any type of reasonable bound for a POSITA to hold onto except "greater is greater is great." In sum, we cannot countenance Clearly's attempt to rewrite and broaden its patent claims.[9]

But merely because we disagree with Clearly's construction does not then necessarily make the claims indefinite. TPI must cross that hurdle themselves and we find it has failed to do so. "The absence of an express reference point in the claim language does not render the terms indefinite so long as the intrinsic record provides sufficient context to inform a POS[IT]A of their meaning with reasonable certainty or where the intrinsic evidence provides an objective reference point." *Bardy Diagnostics, Inc. v. iRhythm Techs., Inc.*, No. 24cv01355, 2026 WL 473782, at *5 (D. Del. Feb. 19, 2026) (citing *Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1395 (Fed. Cir. 2016)). Here, the intrinsic evidence provided by the parties supports the idea that these stacking extensions were intended to be an active choice by the POSITA to have a specific taller functionality at some designated area of the trays. (*See, e.g.*, '624 Patent at 42:55–

[9] We are particularly concerned that Clearly's position was a cynical attempt to broaden its patent claims so that it could then take this construction out to any other thermoformed tray manufacturer and allege patent infringement for even the most minute differences in rim height.

58 (discussing how the stacking extensions are "one or more" places "at which the height is greater" as compared to the rest of the spacer which is "substantially constant").) The figures in the patents provide further support for a definite construction of stacking extension that is tied to its usefulness in keeping space between stacked trays. (*See id.* at 11:50–56 (noting how the stacking extensions can "increase separation between the straight edges of the stacked trays); 29:45–49 (discussing how an extension "facilitates formation of one or more portions of the rolled edge . . . , yielding a structure useful as a stacking lug").)

As such, we are confident that our construction—along with the intrinsic evidence of the patents—supplies the necessary reference point that TPI requests and Clearly ignores. (*See* Doc. No. 143 23–28 (arguing indefiniteness due to a lack of a sufficient reference for a POSITA).) In particular, the requirement that any "stacking extension" be localized removes TPI's concern that any potential variations in height across any segment of the tray could be considered a stacking extension. Further, that the stacking extensions are placed in a way to "space nested trays" stays true to the purpose of the patents, as shown by the intrinsic evidence. (*See generally* '281 Patent, '624 Patent.) So, we construe "stacking extension" to mean "localized portions of the rolled edge that are taller than much of the remaining rolled edge and are configured to space nested trays apart at other portions of their rolled edges."

### D. **"substantially constant"**[10]

| Clearly's Construction | TPI's Construction | Court's Construction |
|---|---|---|
| "plain and ordinary meaning – the height of the spacer is largely but not exactly constant." | Indefinite and lacking written description support under 35 U.S.C. § 112 | "plain and ordinary meaning – the height of the spacer is largely but not exactly constant." |

Related to the "stacking extension" issue discussed above, the parties dispute whether the term "substantially constant" in Claim 27 of the '624 Patent should be given its plain meaning or found to be indefinite. We agree with Clearly and find that "substantially constant" may be given its plain and ordinary meaning. Claim 27, in its entirety reads:

> The tray of claim 25, wherein the height of the flat portion of the spacer, measured from the bend region to the nearest part of the bent portion, **is substantially constant** around the entire periphery of the tray, other than at one or more stacking extensions at which the height of the flat portion of the spacer is greater. 28. The tray of claim 27, bearing a stacking extension at each of the rounded corners.

('624 Patent at 42:53–60 (emphasis added).)

TPI's indefiniteness argument as to "substantially constant" rises and falls with its "stacking extension(s)" argument. (*See* Doc. No. 143 at 33–34.) It claims that "[b]oth conditions cannot be satisfied; either the rim heights are substantially constant, or they are not." (*Id.* at 33.) But TPI is incorrect that merely because Clearly's application of the two terms is internally inconsistent that necessarily means "substantially constant" is indefinite. It is TPI's burden to *prove* indefiniteness with clear and convincing evidence, and the relevant coherence inquiry considers the patent claims, specification, and (if available) prosecution history, not counsel's argument years later. *See BASF Corp.*, 875 F.3d at 1365; *Teva*, 789 F.3d at 1342.

[10] This term appears in Claim 27 of the '624 Patent.

Here, we agree with Clearly that the term “substantially constant” is ascertainable from a review of the claim language and specification and that it may be given its plain and ordinary meaning. As Clearly points out, this understanding of “substantially” has been cited to favorably by the Federal Circuit just this year. *Woodway USA, Inc. v. Lifecore Fitness, Inc.*, No. 25cv1431, 2026 WL 2097813, at *3 (Fed. Cir. July 21, 2026) (“The word ‘substantially’ is commonly used in patent claims and readily understood as a term of approximation meaning, for example, ‘largely but not wholly.’” (cleaned up)); *see also Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1368 (Fed. Cir. 2004) (“The term ‘substantial’ is a meaningful modifier implying ‘approximate,’ rather than ‘perfect.’”); *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1360 (Fed. Cir. 2003) (“The term ‘substantially,’ as used in this context, denotes approximation.”); *LNP Eng’g Plastics, Inc. v. Miller Waste Mills, Inc.*, 275 F.3d 1347, 1354 (Fed. Cir. 2001) (“The meaning of the word ‘substantially’ is ‘largely but not wholly that which is specified.’” (quoting *Webster’s Ninth New Collegiate Dictionary* 1176 (9th ed. 1983))). Nor do we find it necessary for such a term of approximation to need a specific numerical range, especially, as TPI has argued on various occasions, “tiny manufacturing variations inevitably occur in all thermoformed objects.” (Doc. No. 143 at 33.) Considering the Court’s prior construction of “stacking extension,” we do not believe there is any indefiniteness issue with “substantially constant” trays being those with rim heights that are largely but not exactly constant. A POSITA will understand what this term means in the context of the ’624 Patent.

### E. "Glass Transition Temperature"[11]

| Clearly's Construction | TPI's Construction | Court's Construction |
|---|---|---|
| "the temperature at which the thermoplastic softens." | No construction needed | "the characteristic softening temperature associated with the glass transition of the particular thermoplastic material" |

The parties dispute whether the term "Glass Transition Temperature" is a known and defined term for a POSITA, or if it needs construction at all. (Doc. No. 143 at 34–35.) While we find it needs construction, we find Clearly's proposed construction unhelpful and vague.

The parties' written and oral arguments were quite brief, so the Court will endeavor to do the same. Clearly argues mainly from the specification, claiming that its use of "i.e., glass transition temperatures" in all three patents at issue here indicate an intent to define the word that comes prior: softening point. (*See* Doc. No. 143 at 35.) TPI counters with extrinsic evidence in the form of a declaration by its expert, Mark Strachan, which states that "[a] POSITA in the thermoforming art would be extremely familiar with what a glass transition temperature is" (Doc. No. 126-20 ¶ 35), and two thermoforming textbooks which discuss how the glass transition temperature of the material that makes up TPI's products, polyethylene terephthalate ("PET"), is 70°C. (*See* Doc. Nos. 126-17, -18, -24.) And at oral argument TPI made clear it was not advocating for a single textbook definition of glass transition temperature, only one that is specific enough for a POSITA to understand. (*See* 9/9/26 Hr'g Tr. at 103:01–106:02.)

TPI is correct that if the Court were to adopt Clearly's construction, what would almost assuredly be a known and bounded temperature to a POSITA would become completely unbounded. An example makes this clear. The relevant claims at issue here only require the

[11] This term appears in Claim 1 of the '222 Patent, Claims 1 and 29 of the '268 Patent, and Claim 1 of the '865 Patent.

heating to be "to *at least* the glass transition temperature," so it could be higher. (*See, e.g.*, '865 Patent at 49:22 (emphasis added).) Say a POSITA is using PET; so, he knows that the glass transition temperature is 70°C. Under Clearly's construction, if the POSITA heats the PET to 100°C that action would be a temperature at which the thermoplastic softens, i.e., a "new" glass transition temperature. This cannot be correct, as the term glass transition temperature seeks to define is explicit about there being one "softening point." ('222 Patent at 31:38.) Further, while Clearly is correct that courts have found the use of "i.e.," may signal an intent to define, it is not evident that was the case here. For one example, in the '865 Patent, Clearly's purported "definition" comes only after six prior uses of the phrase "glass transition temperature" and even after softening point was purportedly defined as "glass transition temperature" it was never used again after that sentence. Meanwhile "glass transition temperature" was used 11 more times. (*See generally* '865 Patent.) So, we are unconvinced this is the type of situation discussed in the cases cited by Clearly, *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1334 (Fed. Cir. 2009) and *Eye Therapies, LLC v. Slayback Pharma*, LLC, 141 F.4th 1264, 1270 (Fed. Cir. 2025) (both discussing how "i.e.," may signal an intent to define).

In sum, if the Court were to accept Clearly's construction we would be creating a situation where a POSITA must analyze not only if there is a thermoplastic, but also what kind of thermoplastic, and then what "softens" means, how soft is enough, what percentage of the thermoplastic must soften, is there a point at which it becomes too soft? Clearly's proposed construction almost leads to a classic "turtles all the way down" problem. *Rapanos v. United States*, 547 U.S. 715, 754, 126 S. Ct. 2208, 2233 (2006) (citing Geertz, Thick Description: Toward an Interpretive Theory of Culture, in The Interpretation of Cultures 28–29 (1973) (discussing the concept of infinite regress)).

But we also disagree with TPI that the term here needs no construction at all. It may be correct that if the relevant thermoplastic is pure PET, the glass transition temperature will mirror the textbooks. But while PET is "the material[] from which the accused products are made," that does not necessarily limit the patent at issue to the glass transition temperature of PET. (Doc. No. 143 at 35.) There may come a point later in this action where evidence is put forth that the proper glass transition temperature for the accused products is a specific number; but that is a collateral question to the claim construction issue before the Court today. So, we construe glass transition temperature to mean "the characteristic softening temperature associated with the glass transition of the particular thermoplastic material." This definition makes clear to a POSITA what he or she must do, without *requiring* textbook accuracy that may or may not be proper in every situation.

**F. "heating at least a portion of the spacer to at least the glass transition temperature of the thermoplastic"**[12]

| Clearly's Construction | TPI's Construction | Court's Construction |
|---|---|---|
| "heating the thermoplastic at at least a portion of the spacer to a temperature at which the thermoplastic softens."<br><br>The heating step can be performed on an unformed plastic sheet before, during, or after the impinging step. | Indefinite and lacking written description support under 35 U.S.C. § 112.<br><br>In the event the Court finds that this term is supported by the written description and not indefinite, the term should be construed so that the heating of the [sic] at least a portion of the spacer to at least the glass transition temperature must be done after the spacer has already been formed; the heating step is not performed on an unformed plastic sheet. | "heating at least a portion of the spacer of the formed sheet to at least the glass transition temperature of the thermoplastic; heating may overlap with impingement" |

The parties' next dispute is regarding Claim 1 of the '268 Patent. We find that the term here is not indefinite,[13] so the core of the parties' disagreement is whether this heating term can take place prior to the forming of the thermoplastic sheet into what will eventually become the spacer.[14] (*See* Doc. No. 143 at 36–53.) We find that it cannot, though we *again* refuse to align with either party's extreme position. The term here is laid out as part of Claim 1 of the '268 Patent, which states, in relevant part:

> A method of making a tray-shaped article having a smooth periphery, the method comprising

[12] This term appears in Claim 1 of the '268 Patent.

[13] TPI again (*see supra* § II.D.) conflates Clearly's argument regarding what should be the claim construction as the benchmark for assessing whether the claim term at issue is indefinite. But the relevant analysis flows from the Court's assessment of the claims, the specifications, the prosecution history, and sometimes extrinsic evidence. Merely because counsel may—or may not—propose an indefinite construction, does not then mean the patent claim term is indefinite.

[14] While TPI's construction and its briefing appears to argue that the heating step and the impinging step cannot happen simultaneously, at oral argument TPI clarified the limited scope of its concern is just "that the spacer has to exist." (9/9/26 Hr'g Tr. at 123:14–124:05.)

> impinging **a formed thermoplastic sheet** against a ram, the sheet having the shape of a tray, including a substantially planar rim surrounding a concave compartment,
> the rim comprising
> an extension having an inner extent and an outer extent, the inner extent of the extension joining the perimeter of the compartment with
> **a spacer disposed about the outer extent of the extension**,
> **the spacer bearing the peripheral edge of the sheet** at its peripheral-most portion and being connected to the extension by way of a smoothly-curved bend region,
> the **plane of the peripheral-most portion of the spacer being offset from the plane of the rim by an offset angle of at least 60 degrees**,
> the **compartment and the spacer extending away** from the same fact of the rim, and the ram having an upper surface shaped
> to engage the entire peripheral edge of the sheet and
> to **deflect the peripheral-most portion of the spacer** inwardly toward the compartment, thereby increasing the offset angle,
> as the sheet is impinged against the ram;
> **heating at least a portion of the spacer to at least the glass transition temperature of the thermoplastic**;
> continuing impingement of the sheet against the ram at least until the offset angle has been increased to greater than 90 degrees; and
> cooling the sheet while the offset angle remains greater than 90 degrees to yield the tray-shaped article having a smooth periphery.

('268 Patent at 46:64–47:33 (emphases added).) Clearly spills much ink (*see* Doc. No. 143 at 36–46 (more than 15% of the joint brief)) arguing that this Court cannot infer steps onto this method patent when they are not specifically laid out. (*See id.* at 37 (citing *Sandstrom v. Microsoft Corp.*, 24cv1040, 2025 WL 40342, at *6 (Fed. Cir. Jan. 7, 2025).) "However, such a result can ensue when the method steps implicitly require that they be performed in the order written." *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001) (citing *Loral Fairchild Corp. v. Sony Corp.*, 181 F.3d 1313, 1322 (Fed. Cir. 1999) (finding "the language of the claim, the specification and the prosecution history support a limiting construction in th[at] case"); *Mantech Env't Corp. v. Hudson Env't Servs., Inc.*, 152 F.3d 1368,

1376 (Fed. Cir. 1998) (holding that "the sequential nature of the claim steps is apparent from the plain meaning of the claim language and nothing in the written description suggests otherwise")).

Clearly first argues that because the word "formed" only appears in reference to the "thermoplastic sheet" it cannot be imputed onto the spacer because "[i]f the applicant wanted to use the words 'formed spacer' or 'formed portion of the spacer' it knew how to do so explicitly." (Doc. No. 143 at 38.) But Clearly's argument skips over the clear descriptive language in Claim 1 that talks about how the spacer is "disposed about the outer extent of the extension"; it bear[s] the peripheral edge of the sheet"; it is "offset from the plane of the rim"; and how there is a "bend region" that connects the spacer and the extension. ('268 Patent at 47:01–33.) All of this language plainly indicates that the spacer must be more than an unformed sheet. Next, Clearly makes the claim—based only upon the declaration of its expert—that because the plastic material that will form the spacer exists, the spacer exists. (Doc. No. 143 at 39.) We are unconvinced and instead agree with TPI that this contention is akin to a baker looking at flour, sugar, eggs, unsalted butter, cocoa, milk, and baking powder and saying, "there is a chocolate cake." (*See id.* at 47.)

Clearly then argues if the Court does not adopt its construction, we would be violating claim differentiation because it would improperly meld Claim 1 with its dependent Claims 12, 23, and 24. (*Id.* at 38–39.) We are not convinced. Taking each in turn, Claim 12 explicitly contemplates heating the spacer through heating the ram which will be impinged onto the spacer. (*See* '268 Patent at 48:14–18 ("the method of claim 1, where in the ram has a heating element associated therewith and wherein the portion of the spacer is heated . . . by transferring heat from the heating element to the ram and thence to the portion of the spacer.").) The Court's construction—unlike TPI's proposed construction—is not so limited because it allows for

impingement and heating to occur simultaneously, though it does not require it. This construction leaves some necessary daylight between Claim 1 and Claim 12. Similarly, Claim 23 expressly adds “thermoforming a thermoplastic precursor sheet,” but Claim 23 remains narrower than Claim 1 because, as discussed, the formation contemplated by the Court does not require a fully formed spacer prior to any heating. (*See id.* at 48:53–58.) And Claim 24 only piggybacks on Claim 23’s method, it does not establish Clearly’s construction that the spacer need not exist prior to heating. (*See id.* at 48:59–63.)

Next, Clearly overstates the patent prosecution history for a related patent, 15/658,785 (the ’785 Patent). In that patent prosecution, the examiner discussed how prior art had already disclosed using heated molds “to set both the shape and crystallinity of the material.” (Doc. No. 143 at 41 (quoting Doc. No. 126-9).) Yet, Clearly argues this statement is “evidence of how the ‘heating’ step would be understood by a [POSITA] in **all** instances of ‘heating’ in the claims.” (Doc. No. 143 at 42 (emphasis added).) The fact there was prior art available for preheating unformed sheets is unhelpful in determining whether Claim 1 here is discussing a formed spacer or the unformed sheet that would become a spacer.

And, finally, we do not find Clearly’s extrinsic evidence—the declaration of its expert, retained for this litigation—useful. “[E]xtrinsic evidence ‘may be useful,’” but it is “‘less reliable’ than intrinsic evidence, and its consideration ‘is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence.’” *Power Integrations*, 2016 WL 1171496, at *2 (quoting *Phillips,* 415 F.3d at 1318). Here, we find the intrinsic evidence of the claim and specification itself sufficient to support that the spacer must exist prior to being heated. As such, we find the proper construction of this term to

be "heating at least a portion of the spacer of the formed sheet to at least the glass transition temperature of the thermoplastic; heating may overlap with impingement."

### G. "heating the bent portion to at least the glass transition temperature of the thermoplastic"[15]

| Clearly's Construction | TPI's Construction | Court's Construction |
|---|---|---|
| "heating the bent portion to at least the glass transition temperature of the thermoplastic"<br><br>The heating step can be performed on an unformed plastic sheet and/or simultaneously with the forming and/or impinging steps. | Indefinite and lacking written description support under 35 U.S.C. § 112.<br><br>In the event the Court finds that this term is supported by the written description and not indefinite, the term should be construed so that the heating of the bent portion to at least the glass transition temperature must be done after the deflectable flange has already been formed; the heating step is not performed on an unformed plastic sheet. | "heating the bent portion of an existing deflectable flange to at least the glass transition temperature of the thermoplastic; heating may overlap with initial impingement" |

The disputed term here is not indefinite, as we discussed in the section above. (*See* § II.F. & n.13.) And the parties' dispute here is very similar to term 6 as it is a referential dispute about whether the term "bent portion" necessarily limits this method patent to heating only when that deflectable flange that will be bent actually exists. We find that it does.

We begin again with the Claim language, this time of the '222 Patent. Claim 1 of that patent states:

> A method of making a shaped article having a body with a smooth periphery, the method comprising
> forming a thermoplastic into a shape **comprising the body and a deflectable flange** at a peripheral portion of the body, the deflectable flange comprising
> an extension that extends peripherally away from the body and connects thereto

[15] This term appears in Claim 1 of the '222 Patent, which, even though it is not an asserted claim, is the independent claim from which Claim 6 of the '222 Patent depends.

> a bend region having a smooth contour and interconnecting the extension, at an approximately right angle, with a spacer that is connected with
> a peripheral flange which bears a peripheral edge of the thermoplastic, the spacer and peripheral flange being connected, at an angle other than 180 degrees,
> at an elbow;
> impinging a ram against the peripheral flange to deflect the spacer toward the extension, whereby the magnitude of the angle between the spacer and the extension is decreased on account of **at least one portion of the deflectable flange becoming bent**, relative to its pre impingement position, **the bent portion being selected** from the group consisting of the extension, the bend region, and the spacer;
> **heating the bent portion to at least the glass transition temperature of the thermoplastic**; and
> after impinging the ram against the peripheral flange and heating the bent portion to at least the glass transition temperature, further impinging the ram against the deflectable flange to further deflect the spacer toward the extension prior to
> disengaging the ram from the deflectable flange, whereby **the bent portion remains deflected** from its pre-impingement position even upon discontinuation of the impingement to yield the body with a smooth periphery.

('222 Patent at 38:27–61.) The plain language of this Claim discusses how the thermoplastic is formed into a shape comprising (1) the body and (2) the deflectable flange. (*Id.*) At some point after the deflectable flange exists, "at least one portion of the deflectable flange [will] becom[e] bent, relative to its pre impingement position, the bent portion being selected." (*Id.*) Clearly argues that this claim construction does not impute a specific order or requirement that the bent portion of the deflectable flange exist before heating. This is illogical. The phrase "bent portion" is in reference to the "deflectable flange." And just prior to the disputed term at issue, the Claim makes clear there is a process whereby that specific flange "becom[es] bent." (*Id.*) That leads to the most natural reading of the phrase "bent portion". Bent is the past tense of bend. Portion is a section of something tangible. As a matter of ordinary grammar, we find the meaning of the claim here is that this object which is to be heated must already be bent. And the

parties do not dispute that an unformed sheet does not, by logic, bend. (*See, e.g.*, Doc. No. 143 at 54–61.)

This is the type of situation discussed in *Altiris, Inc. v. Symantec Corp.* where the claim language "directly or implicitly require[d] such a narrow construction." 318 F.3d 1363, 1369–70 (Fed. Cir. 2003); *see also Oak Tech., Inc. v. Int'l Trade Comm'n*, 248 F.3d 1316, 1330 (Fed. Cir. 2001) (rejecting a broad proposed construction when "the claim language *itself* imposes significant restrictions on" the term). To use an argument Clearly made related to § II.F., the patentee could have used the words "what will become" prior to "bent portion" if he or she so desired. But without such an interpretation, both the direct and implicit reading of the claim language at issue here indicate "bent portion" cannot refer to the unformed thermoplastic that will become the bent portion of the deflectable flange. Though, as with disputed term 6, above, we find that the heating step considered here may overlap with the initial impingement, because neither the natural reading of the claim nor the specification support a limitation that would stop simultaneous heating and impingement. (*See generally* '222 Patent.) So, we find that the proper construction of the term is "heating the bent portion of an existing deflectable flange to at least the glass transition temperature of the thermoplastic; heating may overlap with initial impingement."

## III. CONCLUSION

For the foregoing reasons, we adopt the above-described claim constructions. An appropriate order follows.